UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                    )
FRANCIS SEPULVEDA,                  )
                                    )
            Petitioner,             )
                                    )
        v.                          )   Civil Action No. 11-11491-JLT
                                    )
GARY RODEN,                         )
                                    )
            Respondent.             )
_____)

REPORT AND RECOMMENDATION ON PETITION FOR WRIT OF HABEAS CORPUS

December 16, 2013

Boal, M.J.

On August 22, 2011, petitioner Francis Sepulveda ("Sepulveda" or "Petitioner") filed, pro se, his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA) ("Petition").  (Docket No. 1). Respondent Gary Roden ("Respondent") opposes the Petition.  (Docket No. 31).

Sepulveda challenges his conviction on second degree murder on the grounds that his guilty plea was not voluntary.  For the following reasons, I recommend that the District Judge assigned to this case DENY the Petition.

I.      PROCEDURAL AND FACTUAL BACKGROUND

On August 22, 2001, Sepulveda was indicted for first degree murder in addition to fourteen other related offenses.  S.A. 49-63, 65.[1]  Sepulveda pled guilty to second degree murder and the other fourteen charges on January 13, 2004.  S.A. 64, 67-68, 79-131.  The Massachusetts

_____
[1] "S.A." refers to the Supplemental Answer of Respondent.  Docket No. 27.

Superior Court sentenced Sepulveda to life in prison for the second-degree murder charge, along with various concurrent sentences for the other charges.  S.A. 68, 128-130.

On January 27, 2004, Sepulveda, through counsel, filed a motion to revise and revoke his sentence under Rule 29 of the Massachusetts Rules of Criminal Procedure (the "Rule 29 Motion").  S.A. 68; Add. 7, 10.[2]  The Rule 29 Motion included an affidavit by Sepulveda's counsel that listed petitioner's plea and the sentence for each offense.  Add. 11.  Sepulveda's counsel requested that no action be taken on the Rule 29 Motion.  S.A. 68; Add. 7, 11.

On June 22, 2009, Sepulveda filed a pro se motion to withdraw his guilty plea and for a new trial under Rule 30 of the Massachusetts Rules of Criminal Procedure (the "Rule 30 Motion").  S.A. 69, 71-76; Add. 7.  The Superior Court denied the Rule 30 Motion on June 26, 2009.  S.A. 69, 77; Add. 8.  Sepulveda appealed this denial to the Massachusetts Appeals Court on July 28, 2009.  S.A. 69; Add. 8, 12.  On November 5, 2010, the Massachusetts Appeals Court affirmed the Superior Court's decision denying the Rule 30 Motion.  Commonwealth v. Sepulveda, 78 Mass. App. Ct. 1107 (2010); S.A. 221-222.  Sepulveda filed for leave to appeal the denial to a Single Justice of the Supreme Judicial Court ("SJC"), which was denied on February 9, 2011.  Commonwealth v. Sepulveda, 459 Mass. 1102 (2011); S.A. 239.

Petitioner had also filed a second pro se motion to withdraw his guilty plea on March 17, 2010, which was denied on March 24, 2010.  Add. 8.

Sepulveda filed the instant Petition on August 22, 2011.  (Docket No. 1).  On November 18, 2011, the Respondent filed a motion to dismiss the Petition as time barred.  Docket No. 9.

---

[2] "Add." refers to the Addendum to Respondent's Memorandum of Law in Support of His Motion to Dismiss the Petition for Writ of Habeas Corpus as Time-Barred.  Docket No. 10-1.

The District Court denied the motion on September 19, 2012. Docket No. 21.

Sepulveda filed a memorandum of law in support of his Petition on January 11, 2013. Docket No. 31. The Respondent filed his opposition on February 11, 2013. Docket No. 31.

## II. FACTUAL BACKGROUND[3]

### A. The Crime

On September 11, 1994, a home invasion which resulted in the death of a seven-year old girl occurred in Lawrence, Massachusetts. S.A. 172. Thereafter, a complaint for murder and an arrest warrant issued against Sepulveda. Id. Sepulveda was arrested in New York on June 28, 2001, nearly six years after the murder. Id. Sepulveda told police officers, "I knew this was going to happen. I'm glad it's all over." S.A. 177. Before the officers got into the car, he also stated "I've been waiting a long time for this. I knew it was coming and I'm glad it's over." Id. While being fingerprinted, Sepulveda talked about the incident. He stated that he had intentionally remained outside while everything was happening, and the only reason he was back in was because he heard shots. S.A. 178. He said that he saw the little girl shaking and told her to calm down and not to yell, that no one would hurt her and then put the tape back on her mouth. Id.

At the change of plea hearing, the prosecution offered the following statement of the facts to support the charges:

> To begin with, the crime or the crimes that the defendant is charged with

---

[3] The factual background is derived from the Massachusetts Superior Court's decision denying Sepulveda's motion to suppress, see Commonwealth v. Sepulveda, 16 Mass. L. Rptr. 231, 2003 WL 21027147 (Mass. Super. Feb. 6, 2003) (S.A. 171 -185) and the transcript of plea proceedings (S.A. 79-131). Neither the Massachusetts Appeals Court nor the SJC recited the facts of the case in their decisions.

took place in Lawrence on September 11th, 1994 at a residence at 10 and 12 Bradford Place in Lawrence.  That was a - - that is a three - - a triple-decker, if you will.  Number 10 is the first floor apartment on the left, and Number 12 is the second and third floor apartment.  They have separate entrances in the front of the building.  It was a free-standing building at basically a dead-end.  There was a commercial building behind the residence which was basically unoccupied at night.  Very quiet, dark corner of the city.

At that time, a woman by the name of Eva Rojas owned the building and she lived on the first floor with her boyfriend, Maximo, and her uncle, Felix Banino Rojas.  Mr. Rojas was staying with his niece for a period of time in that time frame.

On the second floor, the tenant was a man by the name of Jack Marcellini.  He lived in that apartment with Felicia Blidgen, who was his girlfriend and the mother of his two children who were also living there.  The children were very small.

In the third floor apartment, Mrs. Rojas's son, Victor, lived with his girlfriend, Delia Diaz, and their 7-year old daughter, Eva Rojas, who was named after her grandmother.

At that time, Mrs. Rojas owned and operated a, for all intents and purposes, a canteen truck that catered to a Spanish clientele.  She would take the truck out in the evening and go to locations in the city where nightclubs were and so forth and would sell food, prepared food, to people who were out at those locations.

In conjunction with that business, from time to time she needed someone to drive the vehicle to those locations.  It was a big truck, I guess.  And during the time that Mr. Marcellini was a tenant, she asked him a couple of times to fill-in for her, and he did so.  And in conversations with him, she asked if he could connect her with someone who was interested in being a regular driver.

Mr. Marcellini was very close with a man named Jean Montiseer who he called his cousin, who's actually not a blood relative, but someone who grew up with him.  And eventually through his cousin, Mr. Montiseer, Mrs. Rojas was introduced to this guy by the name of Lewis Raoul Row Cruz.  And he did work for her for a period of time in the summer of 1994 driving.

Apparently, Mrs. Rojas and Mr. Cruz did not get along, at least Mr. Cruz didn't like her.  So, he harbored some animosity towards her which he shared with Mr. Marcellini and his friend, Jean Montiseer.  Apparently, he felt that Mrs. Rojas had cheated him out of $50.00 in pay that he was due.  And so, for a

number of weeks in the late summer, he complained bitterly about her attitude and commented on how much money she had and so forth.

And during that period of time, a plan was hatched to steal money from her. It started with Mr. Cruz's anger and animosity towards her, and it grew out of a sense that this group developed that she was a very wealthy woman who had a lot of money secreted in her apartment.

So, in conjunction with that, Mr. Marcellini sought to get some other people to assist in this robbery of Mrs. Rojas. And in that vain, he spoke to Mr. Sepulveda, the defendant here. Mr. Sepulveda and Mr. Marcellini apparently met each other at some prior date before he moved to Bradford Place. And so, they bumped into each other in the city around that time of the end of August, and had a conversation about this scam he referred to it as.

And they followed up that first meeting, which was on the street, with another meeting in the apartment. A young man by the name of Eric Santos was present at that time who was a friend of Mr. Sepulveda and who knew Mr. Marcellini. And at this second meeting, Mr. Marcellini talked about his intention to go downstairs. He told Mr. Sepulveda that he had some other people, and he was looking to recruit some guys that were, you know, tough, big guys to help him with this job.

Mr. Marcellini, during this meeting, according to Mr. Santos, discussed - - he showed a rifle to them and he discussed also having a handgun and indicated that he would use those weapons if he had to.

The wife or girlfriend of Mr. Marcellini eventually talked to the police sometime in January, long after these events took place. And she talked about some of these meetings that took place during this time frame and indicated that Mr. Sepulveda was one of the group that was planning it. And she said that this plan evolved during these meetings.

The target of the burglary, the robbery was always the first floor where they believed Mrs. Rojas had money. But there was some concern because Victor Rojas, her son, lived on the third floor, was not employed at the time. He was always around. The [sic] felt that he was using drugs and that he might - - he was always snooping about. They were concerned that during this invasion of the first floor, that he would detect something, he'd call the police or alert someone.

And so, they expanded the plan to include the people on the third floor. And the idea was that they would go up to the third floor apartment, they would tie up the family up there, neutralize them, and then they would be free to go downstairs to the first floor apartment, steal the money and property, and then get

away.  So, that was the final plan.

On September 9th, a number of Mr. Sepulveda's friends later spoke to the police during the investigation and indicated that that was the night that the plan had - - was going to be put into action.  They all knew that something was going to happen, they didn't know specifically what it was.

And during that time, from the beginning meetings until September 4th - - 11th, rather, Mr. Sepulveda recruited a good friend of his, one of his best friends that he hung around with every day, a man by the name of Gabriel Cruz.  So, he and Gabriel Cruz were taken by one of these friends to a location about one block away from Bradford Place on the evening of September 11th and dropped off.  And later that evening, like an hour or two later, this friend saw them on the street leaving the area of Bradford Place.  When Mr. Sepulveda and Mr. Cruz were dropped off, Mr. Sepulveda was carrying a bag which he had clothes in to change into to do this robbery.

When they got to the house, they waited a period of time until they thought that the family upstairs was in bed.  And then, according to Ms. Blidgen, Mr. Sepulveda, Mr. Lewis Row Cruz and Gabriel Cruz left the apartment out the front door.  The front door of the second floor apartment goes up the hallway, goes up to the third floor as well.  And she heard them going upstairs.

Mr. Marcellini stayed in the apartment for a period of time.  And one of the witnesses indicated that there was a gun that was on the kitchen counter when Mr. Sepulveda and the first two gentlemen left, and that later on when Mr. Marcellini left the apartment - - this is Mr. Montiseer who reported this to the police - - that the gun that had been on the counter was also gone.  The inference being that Mr. Marcellini was the one that left the apartment armed with a firearm.  At least one of the other men had a baseball bat when they left the apartment.  And Ms. Blidgen indicated that Gabriel Cruz was carrying a roll of green duct tape when he walked out of the apartment.

The group went upstairs.  They knocked on the door of the third floor apartment. Victor Rojas, who was in bed, came out to answer the door.  And when he did, the lights were out, this group rushed in.  He was struck by the baseball bat several times by Mr. Row Cruz, according to several witnesses.  And he - - I think he had a broken shoulder.  He had several injuries, rather serious injuries as a result of this initial attack.  He was overpowered and knocked to the ground and basically tied up with speaker wire and duct tape, and then his mouth was taped as well.

While this was going on, other members of the group - - and I don't know who did exactly what in the apartment.  It's not clear.  But Delia Diaz, the mother

of little Eva, and Eva Rojas were both roused out of bed. They were brought into the dining room. Ms. Diaz indicated that she saw at least one man with a rifle when they were forced out into the dining room. Again, the lights were out in the apartment. They were both duct taped and put on the floor there. Their hands and feet were bound and their mouths were taped up. Whoever taped Eva Rojas taped the tape around her head, and in the process of covering her mouth also covered her nose. All the information we have is that that was not intentional, but the result of that is that in a short period of time, Eva was suffocated. She was unable to get any air and she died while she was taped up in the dining room of her home.

The lights were out at that time. Mother and daughter were covered with a sheet. Mr. Sepulveda's job was to guard the third floor apartment while the others went downstairs. And the other three did go downstairs through the back hallway which had access to all three apartments.

They went down, and Felix Banino Rojas was asleep in bed at the time in a rear bedroom off of the kitchen. The men entered the apartment. They went into his bedroom. He was pulled out of bed and he was severely beaten with a baseball bat. They tried to get him, according to Gabriel Cruz who testified at his own trial and in the statement he gave, they were asking him where the money was, and he didn't know what they were talking about, basically. He was beaten for a period of time, and eventually Mr. Marcellini shot him. He had the .22 caliber rifle. Mr. Rojas was shot five times and left lying on the kitchen floor.

There was a padlock on Mrs. Rojas's bedroom where she kept her jewelry and other valuable items. That was broken off. Her bedroom was completely ransacked. The bed was tipped over. Every drawer was pulled out of the bureau. And eventually they did discover a cash of her jewelry, that she had a safe, a lock box there. They took her jewelry from there. They didn't find any money. And the group then left.

Mr. Cruz was very upset because of the shooting that he witnessed. He apparently was not expecting that to have taken place. And they went back up to the second floor, the rear door. Mr. Sepulveda came down from the third floor and they all met at this second floor rear door. They - - in their rush to get in or deliberately, it's not clear, a window in the rear door of the second floor apartment was broken. They were admitted into the apartment. And very quickly, Mr. Sepulveda, Mr. Cruz, and Mr. Marcellini went one way. This Jean Montiseer, Mr. Marcellini's second cousin and this Lewis Row Cruz went another way. And Mr. Sepulveda's friends bumped into him, Marcellini and Gabriel Cruz as they made their way down to the Store 24 on Broadway, which is five or six blocks from this location where the house was located.

There, they left that location with a friend of Mr. Sepulveda, a James

Blake.  They went to Mr. Blake's house.  At Mr. Blake's house, they took the jewelry and divided it into four piles.  Mr. Sepulveda got a share, Mr. Cruz got a share, and Mr. Marcellini took two shares, one for him and one for Mr. Lewis Row Cruz.  And then that group separated.

In the days that followed, we later learned that Mr. Sepulveda gave a ring to his girlfriend at the time, a woman by the name of Iris Calderone.  And this ring was very distinctive in that it had a very large "E" initial on it.  And that is one of the pieces of jewelry that Mrs. Rojas reported that was stolen in the house invasion, and she had receipts to show that she had purchased such a ring.

The ring was never recovered.  The defendant took that back from his girlfriend sometime in the next day saying he was going to have it sized, and she never saw it again.  What did happen the next morning is that the defendants found a newspaper.  The *Lawrence Eagle Tribune*, I assume it was, reported this house invasion and the death of Eva Rojas.

And after that, he asked another friend of his, Mr. Negosian, to keep a packet of jewelry for him for a period of time, which Mr. Negosian did.  About a week later, he asked for it back, and the information he gave to Mr. Negosian was that he and Mr. Cruz went to New York, they sold the jewelry down there, and he was complaining about how little money he got for it.

Ms. Blidgen indicated that when the men came in the back door of their apartment at the time that the window was broken, that Mr. Sepulveda was holding a baseball bat and he said, addressing Gabriel Cruz, "What did you get? What did you get?"  And then the group left.

Mr. Marcellini told her to call the police and report that someone is trying to break into the apartment.  As soon as the men left the apartment, she did as she was told.  The Lawrence Police were dispatched and the officers talked to her.  She said some guys tried to get in my back door, and she showed them the back door.  Then in the course of just walking around to see if there had been any forced entry, they heard Mr. Rojas on the first floor moaning.  They went to investigate.  They found him lying there shot, and called for an ambulance.

About that time, Victor Rojas, the father on the third floor, had managed to move the duct tape off of his face by rubbing it up against the carpet.  He saw the blue lights flashing outside and he began to scream, and the officers eventually heard that.  They came up the back hallway.  The lights were off in the apartment, as I indicated.  They had their flashlights on.  They eventually saw him, and he gestured to where his wife and daughter were covered up. And at that point, they found Eva was basically not breathing.  The tape was cut off as quickly as it could be.  Another ambulance was called.  She was given CPR, but

>   she was never able to be revived.  As autopsy determined that her cause of death was asphyxia.
>
>   Those are the basis facts in the case, Your Honor.  The police investigated it.  No one was talking about what happened.  Eventually around January, a number of people told them little things which led them to Mr. Marcellini and the other defendants.  And around that time when the police began to look for them, Mr. Sepulveda and Mr. Cruz fled the state.  Mr. Sepulveda eventually wound back up in New York where he lived for a number of years under an alias.  He was arrested after the police in Manhattan were tipped off in 2001 that he was wanted for murder in Massachusetts.

S.A. 103-116.

      B.      The Plea Colloquy

Before the recitation of the facts by the prosecution, the judge asked Sepulveda whether his attorney had "explained the nature and the elements of each of these indictments to you and the possible consequences if [he was] found guilty," to which Sepulveda answered yes.  S.A. 90. After the recitation, Sepulveda admitted that the recited facts "fairly and accurately describe [his] part in the case."  S.A. 116.  He also stated that he understood that by pleading guilty, he was admitting that the recitation of facts was true.  S.A. 117.  He indicated that he was pleading guilty "willingly and voluntarily."  S.A. 118.  The judge asked again whether Sepulveda's lawyer had explained to him the elements of the crime to which he pleaded guilty, to which he answered yes.  Id.  He also stated that he had enough time to fully discuss his case, his rights, his defenses, and the consequences of his guilty pleas with his attorney, including "all the options available to [him] in the event [he chose] to proceed to trial."  Id. at 118-119.  Sepulveda admitted that he was "fairly represented" by his attorney, was not confused in any way by the colloquy, he pled guilty because he "wished to do so" and was not aware of any reason why the plea should not be accepted.  Id. at 119-120.  He also told the Court that he understood and

voluntarily signed the "Waiver of Defendant's Rights" form that he reviewed with his attorney. S.A. 120-121. Finally, Sepulveda's attorney told the judge that he had explained to Sepulveda "each of the elements of each of the indictments that have been brought against him" and that they had discussed Sepulveda's rights, defenses, and possible consequences of his guilty plea. S.A. 123.

The judge then found that there was a factual basis for the guilty plea, that Sepulveda's guilty plea was made "knowingly, willingly, voluntarily, and intelligently with full knowledge of the consequences of pleading guilty." S.A. 125. Accordingly, the judge accepted Sepulveda's guilty plea and the agreed-upon sentencing recommendation. S.A. 126.

    C.    <u>The Motion For A New Trial</u>

In his motion for a new trial, Sepulveda stated, among other things, that he pled guilty "reluctantly because I knew that I did not kill anyone and that this whole thing on how Eva Rojas died was unintentional." S.A. 73. He also stated that his lawyer never explained to him the elements of the crimes for which he was charged and that if he had known that first degree murder required "specific intent" and second degree murder required "malice aforethought," he would have chosen to go to trial "because [he] did not even touch that young girl nor did [he] intend her death." S.A. 74.

In a supplemental affidavit, Sepulveda claimed that he was coerced into pleading guilty by a remark made by Marcellini's lawyer, James Krasnoo, with which his own attorney agreed: "If you don't take this second degree life plea, you will come out of prison on a slab." S.A. 76.

In an affidavit, Sepulveda's lawyer stated that "[w]hile I do not have a specific memory of all details, if I told the court that I had explained the elements of the charges, then I know that

I would have done so." S.A. 72.

Sepulveda's motion for a new trial was denied by the plea judge in a margin endorsement as follows:

> Denied. I have carefully reviewed the transcript of the change of plea colloquy, the letter and affidavit of counsel, the original charges, the facts as recited by the Comm. at the COP hearing, Mr. Sepulveda's agreement with those facts, this [defendant's] current misstatement of the consequences of a plea to first degree murder (with which he was charged) as compared to 2nd degree murder which was accepted by the Commonwealth as part of the plea agreement and there is nothing improper. Because of the horrific details of this crime I remember the colloquy even though it occurred 5 ½ years ago.

S.A. 71, 77.

## III. ANALYSIS

Sepulveda challenges his conviction on four grounds. First, he argues that his guilty plea was not voluntary because he was not informed by the judge or counsel that malice aforethought is a necessary element of second degree murder, nor did they explain to him the elements of first degree murder by deliberate premeditation or felony murder. Docket No. 1 at 5. Second, Sepulveda argues that he was not informed by either the judge or counsel about involuntary manslaughter when there was evidence of an unintentional death or that armed robbery while masked did not carry a life sentence. Id. at 7. Third, Sepulveda argues that the judge erred in not holding an evidentiary hearing on his counsel's affidavit, "admitting that [the counsel] did not explain the elements of involuntary manslaughter to the defendant." Id. at 8. Finally, Sepulveda argues that his guilty plea is invalid due to his counsel's incompetence, a behavior falling below a normally fallible lawyer, when counsel advised him to plea guilty without explaining the elements of second degree murder and manslaughter. Id. at 10. This Court disagrees.

A.     Habeas Corpus Standard Of Review

Sepulveda may not obtain federal habeas relief under 28 U.S.C. § 2254(d) unless he can show that the Massachusetts Court of Appeals's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  The "contrary to" prong is satisfied when the state court "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," Williams v. Taylor, 529 U.S. 362, 405 (2000), or if "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a [different] result."  Id. at 406.  The "unreasonable application" prong is satisfied if the state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id. at 413.  In reviewing a case under Section 2254(d)(1), "an *unreasonable* application of federal law is different from an *incorrect* application of federal law."  Id. at 410 (emphasis in original).

The AEDPA also allows relief from a state court judgment if that judgment is based on an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  "Under this standard, 'the state court's factual findings are entitled to a presumption of correctness that can be rebutted only by clear and convincing evidence to the contrary.'"  RaShad v. Walsh, 300 F.3d 27, 35 (1st Cir. 2002) (citations omitted).  "Unless the petitioner can carry this heavy burden, a federal habeas court must credit the state court's findings of fact."  Id. (citations omitted).

"If this standard is difficult to meet, that is because it was meant to be.  As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims

-12-

already rejected in state proceedings." Harrington v. Richter, __U.S. __, 131 S.Ct. 770, 786 (2011) (citations omitted). However, in order to obtain habeas relief from a federal court, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id.

      B.      Involuntary Guilty Plea

"A guilty plea operates as a waiver of important rights, and is valid only if done voluntarily, knowingly, and intelligently. Where a defendant pleads guilty to a crime without having been informed of the crime's elements, this standard is not met and the plea is invalid." Desrosier v. Bissonnette, 502 F.3d 38, 42 (1st Cir. 2007) (quoting Bradshaw v. Stumpf, 545 U.S. 175, 183 (2005)). This rule does not require the judge who took the plea to have explained the elements of the offense to the defendant, provided that the record shows that defense counsel did so. Id. The record need not, however, contain defense counsel's explicit affirmation that he did explain the elements of the crime to the defendant. Id. "[E]ven without such an express representation, it may be appropriate to presume that in most cases defense counsel routinely explain the nature of the offense in sufficient detail to give the accused notice of what he is being asked to admit." Id. (quoting Henderson v. Morgan, 426 U.S. 637, 647 (1976)).

      C.      Ineffective Assistance Of Counsel And Voluntariness Of Guilty Plea

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to . . . have the Assistance of Counsel for his defense." The right to counsel includes the right to effective counsel. Strickland v. Washington, 466 U.S. 668, 686 (1984).

The clearly established federal law relating to ineffective assistance of counsel claims is

based on Strickland. Under Strickland, Sepulveda must show that: (1) counsel's performance was deficient, i.e. counsel made errors so serious that counsel was not functioning as "counsel" guaranteed by the Sixth Amendment; and (2) the deficient performance prejudiced the defense, i.e. counsel's errors were so serious as to deprive the defendant of a fair trial. Strickland, 466 U.S at 687. A lawyer need not be perfect. "Judicial scrutiny of counsel's performance must be highly deferential" and "every effort [should] be made to eliminate the distorting effects of hindsight." Id. at 689. The Court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, that is, the defendant must overcome the presumption that under the circumstances, the challenged action 'might be considered sound trial strategy.'" Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)).

To satisfy the first prong of the Strickland test, Sepulveda must show that trial counsel's performance was deficient to the point of being "objectively unreasonable." See United States v. McGill, 11 F.3d 223, 226 (1st Cir. 1993); Companonio v. O'Brien, 672 F.3d 101, 110 (1st Cir. 2012). Reasonable conduct is conduct that falls "'within the range of competence demanded of attorneys in criminal cases.'" United States v. Bosch, 584 F.2d 1113, 1121 (1st Cir. 1978) (quoting McMann v. Richardson, 397 U.S. 759, 770-771 (1970)). In other words, performance is constitutionally deficient "only if no competent attorney would have acted as [counsel] did." Companonio, 672 F.3d at 110.

To establish prejudice, a defendant must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S at 694. "[T]he question is not whether a court can be certain counsel's

performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently." Harrington v. Richter, 131 S.Ct. at 791-2. "The likelihood of different result must be substantial, not just conceivable." Id. at 792.

The Sixth Amendment right to counsel "extends to the plea-bargaining process," Lafler v. Cooper, __ U.S. __, 132 S. Ct. 1376, 1384 (2012), and "the same two-part standard . . . appli[es] to ineffective-assistance claims arising out of the plea process." Hill v. Lockhart, 474 U.S. 52, 57 (1985). In the context of guilty pleas, where the defendant 'enters his plea upon the advice of counsel, the voluntariness of the plea depends on whether counsel's advice 'was within the range of competence demanded of attorneys in criminal cases.'" Id. at 56. The prejudice requirement "focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process. In other words, in order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Id. at 59.

### D.  The Massachusetts Appeals Court's Decision Was Not Contrary To Or An Unreasonable Application of Supreme Court Law

In its decision rejecting Sepulveda's claims, the Massachusetts Court of Appeals correctly identified the Supreme Court precedent that established the due process principles applicable to guilty pleas. The Appeals Court cited and applied Henderson v. Morgan, 426 U.S. 637, 645-646 (1976), which held that the plea record must demonstrate, inter alia, that the defendant received "real notice of the true nature of the charge against him." Commonwealth v. Sepulveda, 78 Mass. App. Ct. 1107, 2010 WL 4366161, at *1 (Mass. App. Ct. 2010) (quoting Henderson, 426 U.S. at 645) (S.A. 236). The Appeals Court found that Sepulveda was

sufficiently informed of the elements of the crimes to which he pleaded because he admitted at the plea hearing that his attorney had explained the nature and elements of each indictment and the possible consequences of a guilty plea. Id. (S.A. 236-237). The Appeals Court also found that the trial court was not required to believe Sepulveda's affidavit that he was not informed of the elements of second degree murder because the affidavit was contradicted by Sepulveda's and his counsel's responses to the questions posed during the plea colloquy. Id. In addition, the Appeals Court pointed out that Sepulveda's affidavit was contradicted by that of his counsel, who represented that he would not have stated that he explained the elements of the crimes had he not in fact done so. Id.

All of Sepulveda's arguments are based on his assertion that neither the state court judge nor his attorney explained to him the elements of the crimes for which he was charged.[4] However, the Supreme Court has never held that the judge herself must explain the elements of each charge to the defendant on the record. Bradshaw, 545 U.S. at 183. In addition, Sepulveda's own sworn statements during his plea colloquy belie his contention that his attorney did not explain the elements of the crimes to which he was pleading guilty.[5] See Agosto v.

---

[4] Sepulveda also argues that his guilty plea was the equivalent of an Alford plea and, therefore, the plea judge was required to instruct him on both the elements of first and second degree murder. Docket No. 30 at 3. The Alford doctrine allows a defendant to plead guilty without admitting the truth of any or all of the facts essential to the conviction. Lecky v. Holder, 723 F.3d 1, 3 n. 1 (1st Cir. 2013) (citing North Carolina v. Alford, 400 U.S. 25 (1970)). However, it does not appear that the Alford doctrine applies as Sepulveda in fact admitted to the truth of the facts essential to the conviction. See S.A. 116-118. In any event, the First Circuit has not read Alford to require that the defendant understand the elements of both the crime with which he was charged and the crime to which he pleaded guilty. See Desrosier, 502 F.3d at 42 n. 4 (1st Cir. 2007).

[5] As the Appeals Court noted in its decision:

United States, No. 04-cr-10336-NMG, 2012 WL 3518130, at *9 (D. Mass. Aug. 15, 2012) (citing United States v. Santiago Miranda, 654 F.3d 130, 138 (1st Cir. 2011)) ("[A] court is entitled to give weight to the defendant's statements at his change-of-plea colloquy absent a good reason for disregarding them."). Sepulveda had ample opportunity to tell the state court judge that his attorney did not explain to him the elements of each of the crimes to which he was pleading guilty if in fact that was the case, but he did not do so. Thus Sepulveda's own sworn statements undermine his claims.

The Court of Appeals also rejected Sepulveda's arguments that his counsel did not inform him that the Commonwealth was required to prove malice and that he would not have pleaded guilty had he known such proof was required. Sepulveda, 2010 WL 4366161, at *1 (S.A. 237). The prosecution proceeded under a felony murder theory, under which the intent to commit the underlying felony substitutes for the malice aforethought required for murder. Id. (citing Commonwealth v. Matchett, 386 Mass. 492, 502 (1982)). In addition, the Court of Appeals found that accident is not a defense to felony murder. Id. (citing Commonwealth v. McCauley, 391 Mass. 697, 704 (1984)). Also, "even if the Commonwealth had been required to prove malice, the defendant adopted and confirmed the prosecutor's recitation of the facts

---

> For example, the judge inquired of the defendant: "Has your attorney, Mr. Sobelman, explained the nature and elements of each of these indictments to you and the possible consequences if you are found guilty? [R.A. 42]. The judge also asked: "Has your lawyer explained to you the elements to [sic] the crime to which you pleaded guilty? [R.A. 70] On each occasion, the defendant verified that his attorney had explained the elements of the offenses. Similarly, the judge inquired of defense counsel whether he had "explained each of the elements of each of the indictments that have been brought against him [the defendant]," [R.A. 75] and defense counsel stated that he had.

Sepulveda, 2010 WL 4366161, at *1 n. 1 (S.A. 237).

-17-

underlying the crime, which included the forcible restraint and binding with duct tape of a seven year old child." Id. "'Evidence of a single blow to a young child may be sufficient to support a jury's finding of malice' for purposes of second degree murder." Id. (citing Commonwealth v. Lyons, 444 Mass. 289, 294 (2005)). Based on its findings regarding Massachusetts law, which this Court may not review, the Court of Appeals rejected Sepulveda's arguments that his counsel had been ineffective. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) (habeas court cannot review state court's decisions regarding state law).

Finally, the Court of Appeals rejected Sepulveda's arguments that his lawyer was ineffective because he did not inform Sepulveda of the elements of involuntary manslaughter and that his plea was involuntary because he was incorrectly led to believe that masked armed robbery carried a maximum sentence of life imprisonment. Sepulveda, 2010 WL 4366161, at *2 (S.A. 237). Sepulveda has not cited to any federal decision, let alone a Supreme Court decision, requiring that a defendant be informed of the elements of a crime with which he has not been charged or to which he is not pleading. The Appeals Court also found that masked armed robbery does carry a maximum sentence of life imprisonment, a decision of state law that this Court may not review. See Estelle, 502 U.S. at 67-68.

Based on the foregoing, this Court finds that the Massachusetts Appeals Court's decision was neither unreasonable nor contrary to clearly established federal law, nor resulted in an unreasonable determination of the facts.

  E.  <u>Sepulveda Is Not Entitled To An Evidentiary Hearing</u>

In the alternative, Sepulveda requests that the District Court hold an evidentiary hearing on his claims. Docket No. 30 at 35. Evidentiary hearings are disfavored in habeas proceedings

under Section 2254.  Collins v. Roden, No. 08-40217-FDS, 2012 WL 5866257, at *3 (D. Mass. Nov. 16, 2012) (citing Teti v. Bender, 507 F.3d 50, 61 (1st Cir. 2007); Williams, 529 U.S. at 437).  Accordingly, "[a]lthough state prisoners may sometimes submit new evidence in federal court, [the] statutory scheme is designed to strongly discourage them from doing so."  Cullen v. Pinholster, __ U.S. __, 131 S.Ct. 1388, 1401 (2011).

If a claim has been adjudicated on the merits by a state court, review is limited to the record that was before the state court.  Id. at 1400.  An adjudication "on the merits" does not require that an evidentiary hearing be conducted prior to that decision.  See Garuti v. Roden, 733 F.3d 18, 23 (1st Cir. 2013) (citing Atkins v. Clarke, 642 F.3d 47, 48 (1st Cir. 2011)).

Here, although the state court did not conduct an evidentiary hearing, it adjudicated Sepulveda's claims on the merits.  The issues were fully briefed by Sepulveda both at the state trial level and the appellate levels.  The Appeals Court found that the motion judge was not required to hold a hearing on a plea withdrawal motion "as insubstantial" as Sepulveda's.  Sepulveda, 2010 WL 4366161, at *2 (S.A. 237).  The Appeals Court explained that the state court judge was not required to believe Sepulveda's affidavit given that it was contradicted by his own sworn statements during the plea colloquy and by his counsel's affidavit.  Id. at *1 (S.A. 236).  Accordingly, this Court finds that Sepulveda is not entitled to an evidentiary hearing.

IV.   RECOMMENDATION

For the foregoing reasons, I recommend that the Court DENY Sepulveda's Petition for a Writ of Habeas Corpus and his request for an evidentiary hearing.

V.   REVIEW BY DISTRICT JUDGE

The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72(b), any

party who objects to these proposed findings and recommendations must file specific written objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made, and the basis for such objections.  See Fed. R. Civ. P. 72 and Habeas Corpus Rule 8(b).  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Fed. R. Civ. P. 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation.  See Phinney v. Wentworth Douglas Hosp., 199 F.3d 1 (1st Cir. 1999); Sunview Condo. Ass'n v. Flexel Int'l, Ltd., 116 F.3d 962 (1st Cir. 1997); Pagano v. Frank, 983 F.2d 343 (1st Cir.1993).

    /s/ Jennifer C. Boal
JENNIFER C. BOAL
United States Magistrate Judge